## Case No. 16,524.

### UNITED STATES v. TILLOTSON et al.

[1 Paine, 305.] [1]

Circuit Court. D. New York. Sept. Term, 1823.[2]

**PRINCIPAL AND SURETY — RELEASE OF SURETY — ALTERATION OF CONTRACT — CONTRACTS BY WAR DEPARTMENT—POWER OF AGENT.**

1. Sureties are exonerated from their responsibility by any agreement, without their consent, between the creditor and principal, which varies essentially the terms of the contract.

[Cited in U. S. v. De Visser, 10 Fed. 658; U. S. v. Campbell, Id. 820; Minturn v. U. S., 106 U. S. 444, 1 Sup. Ct. 408.]

2. Such an agreement substituting tapia for brick, and altering the mode of estimation and price of labour in the construction of a fort, was held to discharge the sureties.

[Cited in Roman v. Peters, 2 Rob. (La.) 479.]

3. And it is immaterial whether such alterations be for the benefit or to the prejudice of the principal.

[Cited in U. S. v. Case, Case No. 14,743.]

4. Where an agent of the war department was empowered to make a contract, which reserved no right of ratification to the secretary, it was held complete and binding without such ratification.

5. One made a contract with the war department to build a fort, in which it was agreed that advances should be made, in part payment of the work, for materials delivered with the invoice at the fort, and pronounced by the engineer of proper quality, and at the end of each month for the work performed. Large advances having been made, the contract was assigned, and the assignee gave a bond with sureties to account for "advances under and by virtue of the contract." The sureties were held entitled to the benefit of all the limitations provided in the contract, and not answerable for advances made where such limitations were dispensed with, whether the advances were made before or after the making of the bond, the sureties not appearing to have known how such advances had been made.

6. The bond provided that the principal should account "for all such further advances as might thereafter be made to facilitate the execution of the contract." This was held to mean such advances only as were provided for by the contract, and with the same limitations and restrictions.

7. Advances made under such a contract are not a purchase of the materials delivered so as to vest the property in the United States, but it remains unchanged.

8. Where the contracting parties modify the contract so that the rights of the obligor in some particulars are materially varied, it becomes a new contract as it regards the sureties, to which their undertaking does not extend.

9. Whether the death of the principal before the time for the completion of the work had expired put an end to the contract above described and discharged the sureties? Quere.

10. But it seems that they were discharged by the refusal of the war department to suffer the administrator of the principal to proceed to complete the work.

11. Whether the appropriation by congress of only 30,000 dollars to complete the fort, when 690,000 dollars were required, authorized the

---

[1] [Reported by Elijah Paine, Jr., Esq.]

[2] [Reversed in 12 Wheat. (25 U. S.) 180.]

contractor to suspend the work before the appropriation was exhausted, and discharged the sureties? Quere.

[Cited in U. S. v. Hall, Case No. 15,281.]

This was an action of debt on bond.

The bond declared on was executed by Samuel Hawkins, as principal, and the defendants [Robert Tillotson and Nicholas Gouverneur], as his sureties, on the 2d of November, 1819, and was in the penal sum of 150,000 dollars, with the following condition:

"Whereas the late Benjamin W. Hopkins, of the state of Vermont, did, on the 13th day of May, 1818, enter into a contract with General Joseph G. Swift, then chief engineer of the United States, well and truly to construct, or cause to be constructed, at such place, in the vicinity of Mobile Point, in the state of Alabama, as the United States, by any engineer, might direct, a fort, to be constituted of such walls, ditches, embankments, buildings, parts, and dimensions, as the said engineer might, from time to time, prescribe, and to construct the same of such materials and in such manner, as should be prescribed by such engineer, as by the said contract, (reference being thereunto had,) may more fully and at large appear. And whereas, also, the said Benjamin W. Hopkins hath lately died intestate, without having completed said contract, by reason whereof the obligation of performing the said contract, on the part of the said Benjamin W. Hopkins, deceased, has devolved upon the person or persons who may be authorized to administer the personal estate of the said intestate: and whereas further, Roswell Hopkins, father of the said Benjamin W. Hopkins, has taken upon himself the burthen of administering the personal estate of the said Benjamin W. Hopkins, having first been duly appointed administrator thereof. And whereas the said Roswell Hopkins, administrator as aforesaid, hath, by an instrument in writing, under his hand and seal, dated the 27th day of October, 1819, obligated himself legally and fully to assign, transfer, and set over to Samuel Hawkins, of the city of New-York, the said contract, together with all its conditions, stipulations, and advantages thereunto in any wise appertaining; and also all the benefits arising and to arise from the contracts entered into and made by the said Benjamin W. Hopkins, in his lifetime, with various individuals for work and labour, and for furnishing materials, &c. in and about the construction of the said fort, together with all and singular the brick-yards, work-shops, sheds, lumber, and buildings of every description, tools and implements, provisions, mules, slaves, store-houses, horses, carriages, boats, vessels, iron, goods, and merchandises, and all other things provided by the said Benjamin W. Hopkins for the fulfilment of the contract so made by him as aforesaid. Now the con-

dition of this obligation is such, that if the said Samuel Hawkins shall well and truly perform, or cause to be performed, all the covenants, undertakings, and engagements contained in the said contract so made as aforesaid by the said Benjamin W. Hopkins, in his lifetime, for the construction of the said fort, which remains to be fulfilled, and shall also well and faithfully account to the war department of the said United States, for all sums of money heretofore advanced by the said United States, under and in virtue of the last mentioned contract, and also for all such further advances as may hereafter be made to facilitate the execution of the said contract; then this obligation to be void, otherwise to remain in full force and effect."

The contract referred to in the condition of the bond as made between the war department and Benjamin W. Hopkins, was as follows:

"This agreement or contract, made and concluded this 13th day of May, 1818, by and between Joseph G. Swift, chief engineer, on the part of the war department of the United States, on the one part, and Benjamin W. Hopkins, of the state of Vermont, of the other part, witnesseth—That the said Benjamin W. Hopkins, will, for the consideration hereinafter stated, well and truly construct, or cause to be so constructed, at such place, in the vicinity of Mobile Point, Alabama, as the United States, by any engineer may direct, a fort, to be constructed of such walls, ditches, embankments, buildings, parts, and dimensions, as the said engineer may, from time to time, prescribe; and the said Benjamin W. Hopkins will well and truly furnish all materials of such quality, and all artisans, labourers, and workmanship, requisite for the construction of the fort aforesaid, as may be prescribed by the said engineer, and the whole workmanship and materials to be executed and found by the said Benjamin W. Hopkins. And the said Benjamin W. Hopkins will grout, or cause to be grouted, all the walls of the said fort. And that the construction of the said fort shall be commenced by the said Benjamin W. Hopkins on or before the first day of November, 1818; and that the said fort shall be completed, or caused to be completed, by him, the said Benjamin W. Hopkins, by the first day of July, 1821. And the said war department, by Joseph G. Swift aforesaid, will well and truly pay, or cause to be paid, unto him, the said Benjamin W. Hopkins, for the workmanship and materials aforesaid, as follows: That is to say—for every cubic yard of earth excavated and removed as aforesaid, eighty-three cents and eight tenths of a cent; for every cubic yard of brick masonry, eleven dollars; for all carpentry where joists or scantling may be used of dimensions not exceeding in measure ten by ten inches breadth and

thickness, sixty-two cents and one half of a cent per yard, running measure; for all carpentry where joists of dimensions smaller than six inches by eight inches breadth and thickness may be used, forty-four cents per yard running measure; for all flooring with two inch stuff, two dollars and twenty-five cents per square yard; for all flooring with three inch stuff, three dollars and fifty cents per square yard; for all double doors, five dollars and fifty cents per square yard; for all windows, including frames, shutters, sash and glazing five dollars and fifty cents per square yard; for all bunks and ceilings, one dollar and twenty-five cents per square yard; for all wainscoting, thirty-seven and a half cents per running yard; for all iron work, twenty-five cents per pound. And the said Joseph G. Swift, on the part of the United States as aforesaid, will pay or cause to be paid unto him, the said Benjamin W. Hopkins, the amount of value of every cargo of materials, which the engineer aforesaid may pronounce to be delivered of proper quality, at or near the said Mobile Point, for the construction of the fort as aforesaid, the said value and amount to be considered in part payment of the work aforesaid; provided always, that the said Benjamin W. Hopkins shall and do deliver to the said engineer the invoice of the materials so delivered as aforesaid. And the said Joseph G. Swift, on the part of the United States as aforesaid, shall and will pay, or cause to be paid, unto the said Benjamin W. Hopkins the sum of twelve thousand and five hundred dollars, if demanded, at the close of every month, after the work shall have been commenced; provided always, that the said work so done at the close of every month as aforesaid shall amount to twelve thousand five hundred dollars, exclusive of the materials used in the construction of the said work. It is clearly understood by this agreement or contract, that the work shall be executed agreeably to the orders and to the satisfaction of the said engineer or engineers, whom the government may appoint to direct or superintend the works as aforesaid. Also it is understood by the parties hereunto, that all walls of masonry shall be estimated in measurement, by their actual length, breadth, and thickness. This agreement or contract shall be considered binding upon both parties hereunto subscribing, as soon as the secretary of war shall have signified in writing hereupon, his approval of the securities given for the faithful execution of this agreement. It is also understood, that at least thirty thousand cubical yards of masonry will be constructed, and at least one hundred thousand cubical yards of earth will be excavated and removed, in constructing the fort as aforesaid. In witness whereof, the parties have hereunto set their hands and seals, the day and year first above written. Signed, sealed, and delivered in the presence of C. Vanderventer. Geo. Blaney. (Signed) J. G. Swift, Ch. Engineer. B. W. Hopkins."

The following breaches of the condition of the bond were assigned in the declaration. First. That Hawkins did not perform, or cause to be performed, all the covenants made by Hopkins in said contract, which remained to be fulfilled at the making of the bond, inasmuch as Hopkins had agreed that the fort should be completed by the 1st of July, 1821, which was not done, although an engineer was ready at the place to give the requisite directions. Secondly. That the plaintiffs, before the execution of the bond, had paid to Hopkins, under the contract, 90,907 dollars 29 cents, of which Hawkins had notice, but failed to account for it to the war department, except as to 5,902 dollars 3 cents. Thirdly. That the plaintiffs, after the execution of the bond, advanced, at different times, several sums of money to Hawkins to facilitate the execution of said contract; yet that Hawkins had failed to account therefor to the war department, except as to 3,304 dollars 46 cents. Of all which matters the defendants had notice.

The defendants pleaded the general issue, accompanied with notice of special matter, to be given in evidence at the trial.

The cause was not tried; but by arrangement, a bill of exceptions was taken by the plaintiffs to a supposed charge of the court, directing the jury to find for the defendants, in the same manner as if a trial had actually taken place. In order to obtain the opinion of this court upon the points of law arising on the bill of exceptions, a case was agreed upon containing the following facts: Benjamin W. Hopkins began, under the superintendence and direction of an engineer, as provided for by his contract, to construct a fort on Mobile Point, at the place for that purpose designated, according to said contract, and received from the plaintiffs, through their agents, at different times, the sum of 90,907 dollars 29 cents, as appeared from exemplifications of his receipts in the treasury department, and a transcript of Hawkins's account as settled at the treasury. In this account he was credited with work which Hopkins had performed to the amount of 5,902 dollars 3 cents. On the 9th of August, 1819, Hopkins died, without having done any work on the fort, except that for which credit was so given. After Hopkins's death, Hawkins became the lawful assignee of his contract; and after the execution by Hawkins of the before-mentioned bond, he was always admitted and acknowledged by the plaintiffs, or those acting in their behalf, as the lawful assignee, or substitute, of Hopkins, in relation to said contract, and the performance thereof, on his part. Hawkins, after the assignment to him of Hopkins's contract, entered upon the performance thereof, under the superintendence of an engineer, and received several sums of money from the plaintiffs, as appear-

ed by his receipts and account exemplified from the treasury department. In March, 1821, he died, without having completed the fort, and before the time for its completion had expired, having performed no work, nor done any thing else in regard to the erection of the fort, except to the amount of 3,304 dollars 46 cents, for which he was credited in his said account, in different items. Neither Hopkins nor Hawkins ever accounted for the monies received by them, except by the account before referred to. On the 7th of June, 1820, while Hawkins was proceeding in the execution of the contract, Colonel James Gadsden, then acting as the agent for fortifications at Mobile Point, and thereto duly authorized by the war department, entered into a new agreement, or contract, with him, touching the contract with Hopkins, and the erection of the fort, which new contract was in the following words:

"Memorandum of an agreement entered into and concluded this seventh day of June, in the year of our Lord one thousand eight hundred and twenty, at Mobile Point, in the state of Alabama, by and between Captain James Gadsden, of the engineer corps of the United States, in pursuance of instructions of the secretary of the war department of the United States, on the part of the United States, of the first part, and Samuel Hawkins, of the second part, witnesseth: That whereas the late Benjamin W. Hopkins did, on the thirteenth day of May, in the year of our Lord one thousand eight hundred and eighteen, make and enter into an agreement or contract, with Joseph G. Swift, agent, and acting on behalf of the United States, to erect, build, and complete, a fortification for the United States, at Mobile Point, which said fortification was principally, as to the revetment walls, to be built of brick; and for the erecting, building, and completion of which said fortification, the said Benjamin W. Hopkins was to receive eleven dollars per cubic yard for the mason work aforesaid, as will more fully appear by the aforesaid contract or agreement, executed by Joseph G. Swift and Benjamin W. Hopkins, as aforesaid, and now on file in the department of the secretary of war. And whereas the said Benjamin W. Hopkins died some time in the month of August, eighteen hundred and nineteen; and whereas Roswell Hopkins was duly and legally empowered, authorized, constituted, and appointed administrator of all and singular the rights and credits, goods and chattels, which were of Benjamin W. Hopkins, deceased, at the time of his decease; and whereas the said Roswell Hopkins did, on the twentieth day of November, eighteen hundred and nineteen, and on the second day of May, eighteen hundred and twenty, being thereto as administrator legally authorized, make over, assign, and convey, the said agreement or contract, entered into and executed as aforesaid, by Joseph G. Swift and Benjamin W. Hopkins, for a valuable consideration, to Samuel Hawkins, as will more fully appear, reference being had to the said assignments or conveyances, made and executed as aforesaid, by the said Roswell Hopkins, as administrator as aforesaid, to the said Samuel Hawkins; and whereas the said Samuel Hawkins, together with Robert Tillotson, and Nicholas Gouverneur, executed on the second of November, eighteen hundred and nineteen, a bond to the United States of America, in the sum of one hundred and fifty thousand dollars, for the true and faithful performance, by Samuel Hawkins, of all the covenants, undertakings, and engagements, entered into by Benjamin W. Hopkins, in the contract or agreement made by the said Benjamin W. Hopkins with Joseph G. Swift, as aforesaid; and whereas the party of the first part has received authority to substitute for the building, erecting, and constructing the revetment walls of the said fortification at Mobile Point, in the place of brick, a certain composition called tapia; the said tapia to be substituted for brick in such portions of the walls aforesaid, as shall be designated by the superintending engineer of fortifications at Mobile Point, which said tapia is a species of artificial stone, formed by a proper union, in equal proportions, of sharp sand, fresh lime, and oyster shells, with water sufficient to produce adhesion, provided the said Samuel Hawkins would consent to receive ten dollars per cubic yard, in lieu of the eleven dollars contracted to be paid to the said Benjamin W. Hopkins for each cubic yard of masonry. Now, therefore, it is agreed by the party of the first part and the said party of the second part, that such portions of the revetment, and other walls, of the said fortification to be erected at Mobile Point, as the engineer may designate, shall be constructed of tapia; the oyster shells to be broken up, and the composition, running it in the frames, and every necessary operation in the making and placing the said tapia in the revetment walls, is to be made, done, and executed, to the complete satisfaction of the superintending engineer of the fortifications to be erected at Mobile Point. The said party of the second part hereby relinquishes to the United States of America, all claims which he now has, or hereafter may have, in consequence of the assignment aforesaid by Roswell Hopkins, as administrator as aforesaid of the agreement aforesaid, between Joseph G. Swift and Benjamin W. Hopkins, for any lost time, as damages sustained by the said Benjamin W. Hopkins, in consequence of the United States of America neglecting to have an agent at Mobile Point in the fall of eighteen hundred and eighteen, to designate the site of the fortification to be erected at Mobile Point, or instruct the said Benjamin W. Hopkins what he, the said Benjamin, was to do. The said party of the second part hereby agrees, that the following shall be the construction of that part of the contract, entered into by Joseph G. Swift and Benjamin W. Hopkins, which relates to the excavation, viz. The eighty-three

and eight tenths cents allowed for each cubic yard of earth excavated and removed, applies to each cubic yard composing the remblais [3] in its finished state, embracing the several stages of excavation, removing, putting up, ramming, sodding, dressing, &c. and everything necessary to complete the remblais; and that the monthly receipts for labour performed, in reference to this part of the contract, will be by the relays, or for each cubic yard of earth excavated and removed, in proportion to the value the same may bear to its finished state. And it is further agreed between the contracting party of the first part and the said party of the second part, with a view of equalizing the advantages and disadvantages arising from inequalities on the earth's surface at the site of the fort to be erected at Mobile Point, that the quantity of earth composing the remblais in its finished state, on which the said party of the second part will be entitled to eighty-three and eight-tenths cents per cubic yard, agreeable to the stipulations of the contract aforesaid, will be ascertained by measuring the cubical contents of the earth, dug, formed, raised, removed, rammed, and sodded above the level of the parade, now permanently designated and fixed, by the upper surface of a small brick monument, enclosing and supporting a pine stake, marked 'centre polygon;' the said stake being the centre of the fort. And the said party of the second part, hereby agrees to receive ten dollars per cubic yard for every cubic yard which shall be built of tapia, instead of the eleven dollars per cubic yard, agreed to be paid for mason or brick work, as mentioned in the agreement between Joseph G. Swift and Benjamin W. Hopkins. And it is further agreed by both parties aforesaid, that this agreement, or contract, is to have no effect on any part, or construction of any part of the contract. entered into between Joseph G. Swift and Benjamin W. Hopkins as aforesaid, except as in this agreement mentioned. In witness whereof, we have hereunto set our hands and seals, in presence of Horace C. Story, Lieut. Engineers, E. J. Lambert, Lieut. 8th Reg. Infan. (Signed) Samuel Hawkins, James Gadsden, Capt. of Engineers. Certified to be a correct copy from the original. (Signed) E. J. Lambert, Lieut. 8th Infantry, attached to Engineers. —A true copy."

This last contract was entered into by the parties without the knowledge, privity, or consent of the defendants. As soon as it was executed, however, it was transmitted to the war department, and a copy was immediately enclosed to the defendants in a letter from the secretary of war, dated the 10th of July, 1820, in which they were requested to declare their assent or dissent to the contract. in order that it might be determined whether to ratify or reject it. This letter was sent by mail, but there was no other proof of its receipt by the defendants. No answer to it was ever received at the war department, in consequence of which the contract was not ratified by the secretary of war; nor was it ever ratified or acted upon, except so far as it appeared to have been from the transcripts offered in evidence from the war department.

It appeared that Hopkins, in his lifetime, made a claim on the government for expenses and loss of time, which he alleged that he had incurred by the failure of an engineer to attend and point out the site for the fort, as stipulated in the contract. Congress, on the 3d of March, 1821 [3 Stat. 633], passed "an act for making appropriations for the military service of the United States for the year one thousand eight hundred and twenty-one," by which there was appropriated for fortifications 200.000 dollars, in addition to an unexpended balance of 100,000 dollars, to be applied to certain fortifications in the proportions therein designated. among which was mentioned, "Mobile Point, thirty thousand dollars," and no more than this sum could have been advanced by the war department to Hawkins, had more been demanded. But it appeared from an estimate by the engineer department that 690,000 dollars would be required to complete the fort. The administrator of Hawkins on the 18th of May, 1821, addressed a letter to the superintendent of the works at Mobile Point, expressing his regret that an assignee or agent appointed by Hawkins to perform the contract, had not been recognised, and offering himself to go on with the work. To this letter the superintendent replied, that he could not recognise the administrator nor any one else as the successor of Hawkins, without instructions from the war department. In the account of Hawkins with the treasury department, a transcript of which was produced, he was charged with 90,907 dollars 29 cents for advances to Hopkins. It did not appear from the account at what times or for what purposes such advances had been made. But transcripts of various documents were also produced, from which it appeared that a greater part of the advances were for the passage expenses of men, pay to mechanics and labourers, provisions, clothing, and transportation of men, construction of houses for the men, making brick-yards, pay for horses, &c. In most cases where there appeared to have been any materials furnished, they were so blended in the vouchers with other things, that it was impossible to separate them. Those advances which appeared to have been wholly for materials, amounted to only a few thousand dollars. Large advances, but not for work done, were made on account, without any evidence that any thing had been furnished. The advances for materials, where there was evidence that they were for materials, were principally made for materials which it appeared had not been delivered at or near Mobile Point. In June, 1819, Hopkins performed work to the amount of 5,902

---

[3] Remblais. the necessary earth brought on the natural ground. for throwing up a rampart, parapet, glacis, and other earth-work.

dollars 3 cents, for which he was regularly paid at the end of the month. This was the only work done by him. and the only advance made to him specifically for work. It did not appear that invoices of the materials had been furnished, except in a very few instances. Hawkins was also charged in said account, on the 1st of January, 1820, with 10,000 dollars, and on the 8th of September, 1820, with 8,643 dollars 37 cents, and on the 3d of May, 1821, with 2,783 dollars 60 cents, advanced him, without its being expressed for what such advances were made. It however appeared from the vouchers, that 15,000 dollars was advanced before any materials were furnished by him. On the 1st of November, 1820, he was charged with 4,092 dollars 57 cents, for that amount of provisions furnished him by the commissary. The whole amount of materials furnished by him was between five and six thousand dollars. He was credited in said account with the work done by Hopkins, amounting to 5,902 dollars 3 cents, and with work done by himself to the amount of 3,304 dollars 46 cents. Of this, 135 dollars was for work done prior to June, 1820, and the residue for work done during and subsequent to that month, and estimated and charged according to the new contract entered into by Hawkins and Gadsden. The balance of the account due the United States was 107,220 dollars 34 cents.

D. B. Ogden, for plaintiffs.

T. A. Emmet and C. G. Haines, for defendants, contended—

First. That the sureties were discharged by the making of the new contract between Gadsden and Hawkins. 2 Brown, Ch. 582; 2 Ves. Jr. 542; 2 Term R. 256; 2 Johns. Ch. 560; 10 Johns. 182; 2 Caines, Cas. 49; 3 Bin. 523; 3 Madd. 21; 10 Johns. 587, 595; 2 Desaus. Eq. 230, 339, 604; 17 Johns. 384; 3 Price, 214, 218.

Second. That the death of Hawkins exonerated the sureties. [Pollard v. Shaaffer] 1 Dall. [1 U. S.] 210; 2 Co. Inst. 206a; 1 Bac. Abr. 432, tit. "Contract" Q 11; 2 Mod. 200; 12 Mod. 381; 1 Salk. 170; 2 Atk. 18; 3 Burrows, 1637; 2 Call. 286; 7 Mod. 338; Alleyn, 26.

Third. That the performance of the contract was prevented by the plaintiffs: (1) by their refusal to suffer the administrator of Hawkins to proceed to complete the work; and, (2) by the want of a sufficient appropriation by congress. 17 Johns. 364; 19 Johns. 534; 2 Co. Inst. 206a; 3 Com. Dig. 92, 93, "Contract"; Cro. Eliz. 479; 3 Com. Dig. 271, "Covenant" F; Rolle, Abr. 445; 1 Term R. 638; 2 Doug. 694; Id. 688, note; 10 East, 536; [Reily v. Lamar] 2 Cranch [6 U. S.] 345; 1 Salk. 198; 3 Bos. & P. 301.

Fourth. That the sureties were not liable for the advances made, as they were not made agreeably to the contract. 2 Term R. 366, 370; 10 Johns. 180; 2 Caines, Cas. 49, 58, 65.

Fifth. That Hawkins was not bound to account to the war but the treasury department. Act March 3, 1817, § 2 [3 Stat. 366].

THOMPSON, Circuit Justice. The rules and principles of law by which the rights of the parties in this case are to be determined, seem not so much to have been drawn in question upon the argument, as the correct application of those principles to the contracts and circumstances embraced in the case. The defendants are prosecuted as the sureties of Samuel Hawkins, upon a bond duly executed by them, bearing date the second day of November, in the year one thousand eight hundred and nineteen, conditioned for the faithful performance by Hawkins of a contract entered into by him with the proper department of the government for building a fortification at Mobile Point, in the state of Alabama.

It is contended on the part of the defendants, that they are exonerated from all responsibility as sureties, by reason of a subsequent contract entered into with Hawkins, varying essentially as is alleged, the stipulations in the contract, for the performance of which the defendants became sureties. Other grounds were raised and urged on the argument, upon which the sureties claim to have been exonerated from all responsibility, but the one principally relied upon, is the second contract I have referred to. This contract was entered into without the knowledge or consent of the sureties, and nothing was afterwards done by them, in any manner to ratify or confirm the same. The general principles of law applicable to this class of cases, are too well settled and understood, to require authorities or illustration in their support. Sureties cannot be made responsible beyond the scope of their engagement. Any agreement between the creditor and principal, which varies essentially the terms of the contract, without the consent of the sureties, will exonerate them from their responsibility. Any new debt incurred, or the demand enlarged, or any act done to the injury and prejudice of the surety will discharge him from all liability. These are undeniable and controlling rules, and universally admitted, both in courts of law and equity. And the only inquiry before us, is as to their application to the case under consideration.

The bond executed by the defendants, and upon which this suit is brought, contains several recitals stating substantially, that Benjamin W. Hopkins. on the 13th of May, 1818, entered into a contract with Joseph G. Swift, chief engineer of the United States, to construct, or cause to be constructed, a fort, at such place in the vicinity of Mobile Point in the state of Alabama, as the United States by any engineer might direct, and refers to that contract for more particular information respecting it. That Hopkins has since died, and that his administrator had duly assigned and transferred to Samuel Hawkins, the said contract, with all its conditions, stipulations, and advantages, thereunto in any wise ap-

pertaining. And it is admitted in this case, that Hawkins was acknowledged by the authorized agents of the United States to be the lawful assignee of the contract, and that he entered upon the performance and execution thereof, under the superintendence and direction of the agents of the United States. And on the 7th day of June, 1820, the second contract was entered into between Col. James Gadsden, then acting as the agent for fortifications at Mobile Point, and Samuel Hawkins, the legal effect and operation of which as is contended, is to discharge the sureties from all responsibility. Such are the general outlines of the case; and I now proceed to notice more particularly the points that have been drawn into discussion.

The first inquiry which seems naturally to present itself is, the effect of the new contract upon the one for the performance of which the defendants became sureties. It is objected however on the part of the plaintiffs in the first place, that this second contract is not binding on the United States, not having been made or ratified by the proper authority. No reference was made on the argument, to any act of congress pointing out and regulating the mode and manner, in which contracts of this description are to be made; nor am I aware of any law designating any particular mode in which it is to be done. The contract upon its face purports to have been made by competent authority. It expressly declares, that the agreement was entered into and concluded on the part of the United States by Capt. James Gadsden of the engineer corps, in pursuance of instructions from the secretary of war. In addition to which the case expressly states, that it appeared in evidence, that after the execution of the bond, and whilst the said Samuel Hawkins was proceeding in the execution of the contract assigned to him, Col. James Gadsden, then acting as the agent for the fortifications at Mobile Point, and thereto duly authorized by the war department, entered into the contract, &c. Here we find it distinctly admitted, that the agent who acted in behalf of the United States was duly authorized to make the contract. And it is worthy of remark, that the case was made up by the parties without any trial, upon facts and documents agreed on and admitted by the parties, so that no mistake or misapprehension could have occurred, either with respect to the purport of the evidence or its competency to establish the fact; and if any thing farther could be necessary to show that this contract was binding on the United States, the case furnishes sufficient evidence that it was ratified by the proper department. For by Schedule B, it appears that after the 7th of June, 1820, the date of the second contract, money was advanced to Hawkins, and credit given to him for work performed according to the stipulations in the second agreement.

I shall therefore assume it as undeniably established, that this second contract was duly and legally made, and is binding on the United States, and the next inquiry will be, whether any and what alterations are thereby made in the original agreement. Although it was urged on the argument by the plaintiffs' counsel, that there was no material difference between the old and the new agreement, it appears to me impossible to read the two, without at once discovering the most essential difference. The only points of difference, that I deem it necessary to notice here, are first, the substitution of tapia for brick in the formation of the revetment walls, and the reduction of the price from eleven to ten dollars per cubic yard, and secondly, the new stipulation as to the price for excavation.

It was contended on the part of the plaintiffs, that under the original contract with Hopkins it was left in the discretion of the engineer to direct of what materials the walls of the fort were to be made. If the contract could by possibility admit of such construction, the mind would be irresistibly led to the conclusion, that such an incautious and unguarded stipulation must have crept into the contract by inattention or mistake. It is inconceivable that any man would knowingly place himself so entirely at the will and pleasure of another, in a contract of such magnitude, and expose himself to the hazard of being required to build the walls of this fort of marble instead of brick, at the price of eleven dollars per cubic yard. But the contract admits of no such construction; and it is inconceivable to me, how the learned counsel could have been led into such a palpable misconception of the contract. I can account for it in no other way, than that he must have been misled by the recital in the bond. It is true that in reciting the contract with Hopkins, it is stated that he was to construct the fort of such materials, and in such manner, as should be prescribed by the engineer, as by the contract, (reference being thereunto had,) may more fully appear. On reference to the contract, this appears clearly to be a misrecital. The contract only provides that the materials should be of such quality as the engineer should direct, but the contract throughout manifestly shows that the walls were to be built of brick. It expressly provides that the contractor was to receive eleven dollars for every cubic yard of brick masonry. And that such was the understanding of all parties is manifest, both from the special provisions, and general scope of the second contract. In reciting the contract with Hopkins it is expressly stated, that the fortification was principally, as to the revetment walls, to be built of brick, and that Col. Gadsden had received authority to substitute for the building, erecting, and constructing the revetment walls of the fortification, in the place of brick, a certain composition called tapia, being a species of artificial stone formed by a proper union in equal proportions, of sharp sand, fresh lime, and oyster shells, with water sufficient to produce ad-

hesion. This tapia to be substituted for brick, in such portions of the walls as should be designated by the superintending engineer. And Hawkins stipulates to receive ten dollars for every cubic yard which should be built of tapia, instead of eleven dollars for every cubic yard agreed to be paid for mason or brick work, as mentioned in the agreement between Swift and Hopkins. Can there then be the least possible doubt, that by the first contract the principal walls of the fort were to be built of brick, and that by the second contract, tapia was to be substituted in the place of brick, and that the price per cubic yard was to be reduced from eleven to ten dollars? If this is not a material alteration of the contract for the performance of which the sureties became bound, it is difficult to say what would be deemed a material alteration. But whether this alteration was for the benefit or to the prejudice of Hawkins, cannot enter into the question. This was a matter upon which the sureties had a right to judge for themselves; and it was not in the power of the plaintiffs to transfer the suretyship from one contract to another, without the consent of the sureties. The first contract became functus officio, so far as it was altered by the second. The latter, with the adopted part of the old contract, became the one to which the plaintiffs must look for performance of the stipulations between the parties. Both contracts could not be in force at the same time, so far as they are incompatible with each other; and to say that the latter was not in force and binding, would be denying to the parties the right of modifying and altering their own engagements.

But admitting the first contract in part to remain in full force, as to Hawkins, the second was an essential alteration or modification of it, and cannot be binding on the sureties in this new shape. Such a rule would be placing it in the power of the principal to draw his sureties into responsibilities they never assumed, contrary to the established doctrine of the law in relation to principals and sureties. If Col. Gadsden, as appears by the contract itself, and as the case expressly admits, was duly authorized to make the second contract, no subsequent ratification by the war department was necessary. And the case furnishes no evidence of any such usage or practice, nor has any law been referred to requiring this to be done. The letter therefore written by the secretary of war to the sureties, to declare their assent or dissent to the contract, even if it had been received, could have had no effect upon the contract; it was at this time complete and binding on both parties. The sureties were not bound to give any answer. They had a right to remain silent, and avail themselves of the legal effect of the second contract upon their responsibility. And besides, it appears from the schedule already referred to, that at the very date of this letter, (July 10th,) the work at the fortifica-

tion was going on under the new contract, for credit is given according to the modification by the second contract, which shows the understanding of the parties, that the contract was complete without the ratification of the secretary of war.

It is said, however, that it is reasonable to infer that the contract was made subject to the ratification of the secretary of war, because such was the provision in the contract with Hopkins. Even admitting this reservation in Hopkins's contract, it does not warrant the conclusion drawn from it, but rather affords a contrary inference that a special reservation in the contract for such ratification was necessary. Besides, the instructions to General Swift might have been very different from those to Col. Gadsden. What the former were, does not appear. But the case shows expressly that the latter was duly authorized by the war department to enter into the contract, and upon the face of which it is stated, that he acted in pursuance of his instructions. The reservation however, in the contract with Hopkins, is not as it seems to have been understood by the counsel; it only reserves to the secretary of war his approval of the sureties given for the faithful execution of the agreement.

The second point of difference between the two contracts which I am to notice, is that which relates to the price for excavation. In the contract with Hopkins, the stipulation on the part of the United States, is to pay for every cubic yard of earth excavated and removed, as aforesaid, eighty-three cents and eight-tenths of a cent. To what part of the contract the aforesaid refers, is not easily perceived. There is no provision respecting the excavation and removal of earth, except what is implied under the terms "ditches" and "embankments," in that part of the contract which declares that the fort shall be constructed of such walls, ditches, embankments, buildings, parts, and dimensions, as the engineer may from time to time prescribe. And that it was understood to apply to this part of the works, will appear from the certificate of John Bliss the superintendent, being one of the documents referred to in the case. He certifies, that 7,043 cubic yards of earth had been excavated from the ditches of the fortifications at Mobile Point by B. W. Hopkins, for the quarter ending 30th June, 1819. Upon which, an account is made out as follows: "7,043 cubic yards of earth at eighty-three cents and eight tenths of a cent, agreeably to contract, five thousand nine hundred and two dollars and three cents," which was duly paid. In the last contract we find the following clause relating to this subject: "The party of the second part (Hawkins,) hereby agrees, that the following shall be the construction of that part of the contract entered into by Joseph G. Swift and Benjamin W. Hopkins, which re-

lates to the excavation, viz.: The eighty-three and eight-tenths cents, allowed for each cubic yard of earth excavated and removed, applies to each cubic yard composing the remblais in its finished state, embracing the several stages of excavation, removing, putting up, ramming, sodding, dressing off, and every thing necessary to complete the remblais; and that the monthly receipts for labour performed in reference to this part of the contract, will be by relays, or for each cubic yard of earth excavated and removed, in proportion to the value the same may bear to its finished state." Although this purports to be a construction of the first contract, no one can read the two provisions without at once perceiving a manifest difference, and that the labour to be performed by Hawkins is increased, and the monthly payments therefore reduced.

Without noticing in detail, the particulars in which the contracts disagree in this respect, I shall only mention one about which there can be no difference of opinion, viz.: the sodding of the remblais. No possible construction of the first contract could impose this upon the contractor. It is therefore an increased burden put upon him, and one too of no inconsiderable importance as to expense, which, if the sureties were bound to see done, would be increasing their responsibility beyond their engagements, and enlarging the demand against them without their consent.

But it is said that the defendants are not called upon to perform specifically the contract for the performance of which they become sureties, or for the payment of damages for the non-performance; but to reimburse the advances made to Hopkins and Hawkins, beyond the amount they were entitled to receive for work done and materials found. And for this it is alleged, there is an express stipulation in the bond upon which this suit is founded. A little attention to the provisions in the bond, and in the contract with Hopkins, will show that this claim cannot be enforced against the sureties. By the bond the defendants among other things, became bound that Hawkins should well and faithfully account to the war department of the United States, for all such sums of money theretofore advanced by the United States, under and in virtue of the late-mentioned contract, and also for all such further advances as might thereafter be made to facilitate the execution of the contract. If the United States have made any advances not required, or warranted by the contract with Hopkins, they have been made on their own responsibility, and for which the defendants cannot be held accountable. They only stipulate that Hawkins shall account for all advances under and by virtue of the contract. The case furnishes no evidence that the sureties were apprized of what advances had

been made to Hopkins, or that they had any knowledge of the state of the accounts between him and the United States. The sureties were bound only to look to the contract, to learn the extent of their responsibility. And they are entitled to all the guards and checks it contains to shield them from risk and hazard. This was doubtless taken into their calculation when they became sureties, and the United States were bound not to transcend these limits, and thereby expose the sureties to risks they never meant to assume.

We must then look to the contract to ascertain what advances were authorized; and the only stipulations we there find upon this subject are, that the United States will pay, or cause to be paid, to Benjamin W. Hopkins, the amount of value of every cargo of materials, which the engineer aforesaid may pronounce to be delivered of proper quality, at or near the said Mobile Point, for the construction of the fort as aforesaid—the said value and amount to be considered in part payment of the work aforesaid: provided always, that the said Benjamin W. Hopkins shall and do deliver to the said engineer, the invoice of the materials so delivered as aforesaid. And that the United States shall pay, or cause to be paid, to the said Benjamin W. Hopkins, the sum of twelve thousand five hundred dollars, if demanded at the close of every month after the work shall have been commenced: provided always, that the said work so done at the close of every month as aforesaid, shall amount to twelve thousand five hundred dollars, exclusive of the materials used in the construction of the said work. The sureties have a right, and doubtless did take into their calculation, that these checks would be strictly adhered to; and if so, the risk they incurred was comparatively trifling. No advances were to be made for materials until they were deposited at the place where the fortification was to be built, and duly approved by the superintending engineer. All the sureties had therefore to see to, with respect to the materials, was their faithful application to the contemplated works. This was a mere guaranty of the integrity and good faith of the contractor, and no advances on account of labour were to be made until the work was done. So that no risk whatever was here incurred.

The amount claimed in this suit is one hundred and seven thousand two hundred and twenty dollars thirty-four cents, of which sum ninety thousand nine hundred and seven dollars twenty-nine cents, is the balance standing against Hopkins. No detailed statement of the account with him accompanies the case. The items therefore of which it is composed, and the grounds upon which this balance is struck, does not appear. Enough however is shown by the documents, to make it evident, that a great proportion of this balance is made up of advances, not required by the contract with Hopkins; being neither for ma-

terials delivered, nor work done upon the fortifications. Most of the expenses incurred, and for the payment of which the advances were made, related to preparations for commencing the works, as will be seen by reference to the documents accompanying the case; and if I am correct in the construction I have given to the engagement of the sureties, they are not responsible for these advances. The case does not furnish materials to enable me to say to what extent the advances were made, under and by virtue of the contract. And the advances on account, and drafts for materials and labour properly falling within the contract, are so blended with others, that it is impossible to separate them. Thus the first draft of the 15th of November, 1818, for three thousand dollars, purports to be for materials and passage-expenses of men, &c. That of the first of December, in the same year for ten thousand dollars, is for materials and expenditures on account of fortifications, &c. So also it appears from a certificate of Col. Gadsden upon some of Hopkins's accounts, and which was intended for and received as an authority for an advance of upwards of thirty thousand dollars. The items consisted of invoices of provisions, clothing, lumber, transportation of men, construction of accomodations for them, expenses of brick-yards and pay of men employed at them; expense of excavators, their provisions and transportation, and quarters for their accomodation. Advances to a considerable amount appear likewise to have been made for brick at the kilns, and before delivery as provided by the contract. And to hold the sureties responsible for all these advances, would certainly be extending their liability far beyond the scope of their engagement. The plaintiffs are bound to make out distinctly the extent of the defendants' liability.

But it is said the defendants are responsible for all advances made to Hawkins without limitation or qualification: that their undertaking for him in that respect is different from that which relates to advances to Hopkins. For the purpose of examining the soundness of this distinction, we must recur again to the bond, and look at the whole clause, which embraces both objects. It reads thus: He (Hawkins) "shall well and faithfully account to the war department for all sums of money heretofore advanced by the United States under and in virtue of the late mentioned contract," (thus far relates to advances to Hopkins,) "and also for all such further advances as may hereafter be made to facilitate the execution of the contract." A fair construction of the latter clause, does not make it broader or more extensive than the former. The recitals in the bond showed, that the contract had been assigned to Hawkins, and the object of the arrangement was to put Hawkins in the place of Hopkins under the contract. And he is to account for such further advances as may be made to him. Such advances, necessarily imply like

advances to those before made to Hopkins, and of course under the same limitations and restrictions. It was urged on the argument, that there were no limits, but the discretion of the war department, to such advances if they would facilitate the execution of the contract. But this is not a natural or fair construction of the clause. No new object or inducement was presented to justify the conclusion, that more liberal advances were to be made to Hawkins, than Hopkins by his contract was to have made to him. Both were to facilitate the execution of the contract, by furnishing the contractors with funds to pay for the materials as delivered, and to enable them to pay off the workmen monthly. The sureties cannot therefore be made responsible for advances to Hawkins, except for materials delivered at the place, and for work actually done. It is not understood by the contract, that the materials were to be delivered to the agents of the United States so as to become their property, and remain at their risk. The property still continued in the contractor, and the sureties were responsible for its faithful application to the building the fortification according to the contract. Whatever work therefore has been done according to the contract, the plaintiffs have had the benefit of it, and there is no complaint that the materials delivered have been misapplied. Upon this view of the case then, there is no foundation for any claim upon the sureties.

It has been further urged in discharge of the sureties, that by the last contract, Hawkins relinquished all claim to an allowance to which he was entitled, in consequence of the United States neglecting to have an agent at Mobile Point in the fall of 1818, to point out the site of the fortification, and to give the necessary instructions to Hopkins. The case states, that Hopkins in his lifetime did make a claim to a considerable amount on this account. And the very fact, that a relinquishment of it by Hawkins was inserted in the new contract, would seem an implied admission, that some importance was attached to it. And if Hawkins has by any stipulation with the plaintiffs or their agent, relinquished any benefit to which he was entitled under the contract, it was an act to the prejudice of the sureties.

The case has thus far been considered under the supposition, that the original contract with Hopkins remained valid and binding, except so far as it was altered by the new contract with Hawkins; and this may be true as between the parties themselves. But as it respects the sureties, very different considerations are presented. The law is particularly watchful over the rights of sureties; and will not countenance any transactions between the parties that shall lessen the ability of the principal to comply with his contract, or that shall alter the rights of the parties, or enlarge the demand to the prejudice of the sureties. To permit parties to modify and alter their contracts

as they please, and to hold the sureties answerable for the performance of such parts as were not altered, would be transferring their responsibility without their consent from one contract to another. The contract by the modification and alteration becomes a new and a different contract, and one for which the sureties never became responsible.

Under these views of the case, I am satisfied that the defendants are not answerable for the claim set up against them, and I might here dismiss the cause. But it may not be amiss briefly to notice some other points urged upon the argument in support of their defence, and which would certainly be entitled to great weight, were it necessary to draw them into examination and to decide upon them.

It was contended, that the death of Hawkins before the expiration of the time limited for the completion of the work, put an end to the contract and discharged the sureties. Without expressing any opinion upon this point, the facts in the case present an alternative in exoneration of the sureties, that cannot easily be surmounted. If the contract survived, its performance devolved upon the personal representative of Hawkins, who, it appears, offered to go on and execute it, but was refused permission so to do by the agent of the United States; saying he must have instructions from the war department for that purpose. The offer was forwarded to the department, and no answer given, which was equivalent to a refusal. Why this offer was refused is not readily perceived, as by the contract no advances were to be made for materials until delivered, or for work until performed, so that no great risk would have been thereby incurred. And by the recitals in the bond upon which this suit is founded, it would appear to have been the understanding of the parties, that upon the death of the contractor, the obligation, and duty of completing the contract, fell upon his personal representatives. The recital to which I allude is as follows: "Whereas the said Benjamin W. Hopkins has lately died intestate, without having completed the contract, by reason whereof the obligations of performing the said contract, on the part of the said Benjamin W. Hopkins, deceased, has devolved upon the person or persons who may be authorized to administer the personal estate of the said intestate." We find also the same admission in the second contract, made between Col. Gadsden and Hawkins. It recites the death of B. W. Hopkins, and the granting of administration to Roswell Hopkins, who as administrator, was legally authorized to assign the contract to Hawkins.

Again, it was urged that all obligations growing out of the contract are discharged, by congress withholding the appropriation necessary to complete the works. By the original contract, the fortification was to be completed by the first of July, 1821. By the act of the 3d March, 1821, only thirty thousand dollars was appropriated to this object, and it is admitted, that no more could have been applied to it until a further appropriation was made; and the case states. that six hundred and ninety thousand dollars was necessary to complete the fortification. If this act had made it unlawful to proceed further with the works, it might well be urged that the contractor was discharged from all obligations and accountability growing out of the contract, the performance having become illegal by a legislative act. But as the necessary appropriation was only in part withheld, the operation of the law probably ought to be considered only a temporary suspension of the execution of the contract. And should no further appropriation be made, the contractor, were he living, could not be called to account in any manner for a breach of contract. The plaintiffs could not certainly be permitted to stop short when they pleased, and demand a reimoursement of the money advanced. Even admitting that Hawkins was accountable for all advances to Hopkins, there could be no violation of his engagement in this respect until the expiration of the term allowed for completing the contract; and if the plaintiffs by their own act, have either suspended or entirely defeated the performance, it does not lie with them to allege a breach on the other side.

I am accordingly of opinion that the defendants are entitled to judgment.

[This judgment was reversed by the supreme court. 12 Wheat. (25 U. S.) 180.]